UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

IN RE:

    DANIEL JOSEPH SUTTER                    Case No:    05-38115
    SHERYL LYNN SUTTER,                      Ch. 13

    Debtors.
_____/

## OPINION ON REMAND FROM THE DISTRICT COURT ON EQUITABLE MORTGAGE ISSUE

This case is before the Court on remand from the District Court for the Eastern District of Michigan. The Debtors appealed two orders entered by this Court. The first appeal involved the Court's ruling that disallowed the Debtors' claimed exemption in real property under 11 U.S.C. § 522(g). The second appeal pertained to the Court's decision granting the Trustee's motion to sell property of the estate. The District Court reversed and remanded this case for this Court to first determine if an equitable mortgage exists on real property owned by the Debtors. For the reasons fully explained in this opinion, the Court imposes an equitable mortgage on the property located at 727 N. Monroe Street in Lapeer, Michigan.

### I. Jurisdiction

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1) and E. D. Mich. LR 83.50(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (N), and (O).

### II. Procedural History

Due to the commencement of foreclosure proceedings on their residence, Daniel and Sheryl Sutter (the "Debtors") filed for relief under Chapter 13 of the Bankruptcy Code in November 2005. Creditor, Saxon Mortgage Services, Inc., filed its proof of claim on December

8, 2005. Debtors filed an objection to Saxon's claim on February 21, 2006. In May 2006, the Debtors commenced an adversary proceeding seeking, among other relief, the disallowance of Saxon's claim by challenging the validity of its lien on the real property located 727 N. Monroe Street in Lapeer, Michigan under 11 U.S.C. § 502(b)(1) (Count I) or, alternatively, the avoidance of Saxon's claim under 11 U.S.C. § 544(a)(3) or § 547 (Count II). The complaint consisted of seven counts and named in addition to Saxon the following defendants: New Century Mortgage Corporation, U.S. Bank National Association as Trustee for Home Equity Loan Trust 2004-HE5, and James Cohen. Based on the parties' stipulation, the Chapter 13 Trustee, Carl Bekofske, was added as a plaintiff in this proceeding in November 2006.

In February and March 2007, summary judgment motions were filed by Saxon, U.S. Bank, and the Debtors. At the end of the hearing on the cross-motions for summary judgment on April 24, 2007, the Court granted the Debtors' motion for summary judgment on Count I and Count II of their complaint and against defendant, U.S. Bank.[1] The Chapter 13 Trustee objected to the proposed order prepared by the Debtors. On July 25, 2007, the Court entered an order avoiding the mortgage purportedly conveyed by the Debtors on the Property and preserving the mortgage for the benefit of the bankruptcy estate under 11 U.S.C. § 551. This order was not appealed.

On June 8, 2007, Debtors filed their fourth amended schedule C to claim an exemption in the Property under 11 U.S.C. § 522(d)(1) of $40,400 and representing that the current value of the Property as $70,000. The Chapter 13 Trustee, U.S. Bank, and Saxon filed objections. The focus of February 5, 2008 hearing involved whether the Debtors were entitled to claim an exemption in the Property under 11 U.S.C. § 522(g).[2] Based on the evidence in the record, the

---

1. This Court made additional findings on the summary judgment motions before it as to the other counts in the complaint. These findings, however, are not relevant to the matter currently before the Court.

2. Section 522(g) states:

> Notwithstanding sections 500 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if —

2

Court sustained the objections raised to the Debtors' exemption of the Property after determining that the Debtors were not entitled to the exemption provided under § 522(g). An order disallowing the Debtors' claimed exemption of the Property was signed and entered on February 29, 2008. The Debtors appealed this order.

On September 19, 2007, the Chapter 13 Trustee filed a motion seeking approval to sell the estate's interest in the mortgage to Saxon. The Debtors objected to the Trustee's motion. A hearing on the Trustee's motion was held on March 12, 2008. At the conclusion of the hearing, the Court overruled the Debtor's objections and granted the Trustee's motion. An order authorizing the Trustee to sell the estate's interest in the mortgage to Saxon for $30,000 was signed and entered on March 31, 2008. The Debtors appealed this order.

On September 23, 2008, the District Court issued its decision reversing this Court's February and March 2008 orders by stating, in pertinent part, that

> The bankruptcy court based its rulings in large part on the inference that an equitable mortgage exists and that [the Debtors] clearly intended to grant a mortgage to New Century Mortgage. However, while such determination is critical to the outcome of this case, the bankruptcy court merely made such a statement *in dicta* and reserved the option to make a specific holding regarding such if need be. Additionally, the [Defendants] based a significant portion of [their] arguments against [the Debtors] on the existence of an equitable mortgage. The bankruptcy court's determination that the transfer of property was voluntary was primarily based upon the argument that it appeared that [the Debtors] "intend[ed] to execute a mortgage."
>
> . . . . The finding of whether or not an equitable mortgage exists is essential to this court's determination about whether the transfer was voluntary or involuntary. . . . .
>
> Accordingly, the February 29 and March 12, 2008 Orders must be reversed and the case remanded to the bankruptcy court for a determination as to whether an equitable mortgage exists and application of such finding to the appealed orders.

---

(1) (A) such transfer was not a voluntary transfer of such property by the debtor; and
   (B) the debtor did not conceal such property; or
(2) the debtor could have avoided such transfer under subsection (f)(1)(B) of this section.

3

(Mem. Opn. and Ord. at 5-6 (Docket number 185) (emphasis in original).) The Court conducted a status conference on November 6, 2008. During this conference, the parties agreed that it was not necessary to have oral arguments on this case and instead requested that the Court decide the issues on remand based on their briefs and the record. The Court established a briefing schedule. The briefs timely submitted by the parties are limited to the equitable mortgage issue.

### III. Facts

The relevant facts in this case are not in dispute. In September 1994, the Debtors purchased their home located at 727 North Monroe Street, Lapeer, Michigan (the "Property"). (Ex. A, Dep. Tr. Sheryl Sutter at 10 lns. 14-16, January 18, 2007 (Docket number 139)).  In January 2004, during the pendency of the Debtors' prior Chapter 7 bankruptcy case, the Debtors contacted World Wide Financial (a/k/a Loan Giant) ("World Wide") and spoke with Mr. Ruszkewicz, a loan representative, to inquire about their ability to refinance the existing loans on the Property. (Ex. A, Dep. Tr. at 13 lns 1-2 (Docket number 139)). The Debtors sought to refinance these loans to reduce their then existing monthly payment, lower their interest rate of 15.5% and to use some of the equity in their Property to make necessary repairs to it. (Ex. A, Dep. Tr. at 12 lns 21-25 and Ex. B, Dep. Tr. Daniel Sutter at 9 lns 1-5, January 18, 2007 (Docket number 139)). Although the Debtors' first loan application was denied, they continued their efforts to obtain a loan by submitting a second loan application and then a letter explaining ("Letter of Explanation") their poor credit history. (Ex. A, Dep. Tr. at 23 lns 11-25 and 24 lns 1-3 and Ex. B, Dep. Tr. at 10 lns 13-18 (Docket number 139)). In their Letter of Explanation, the Debtors described the personal and financial challenges they had experienced beginning in 1992 and explained that

> We have the means to make the payments. We have a way to get our lives back on track with this mortgage and put some of the ten years of stress behind us. I hope you will please give us due consideration.

(Ex. C (Docket number 139)). The Debtors were approved sometime in March 2004.

Due to the Debtors' previously planned vacations to California and a cruise through the Hawaiian islands, Mr. Ruszkewicz made arrangements for the closing to occur in California. (Ex. A, Dep. Tr. at 24 lns 5-18 and Ex. B, Dep. Tr. at 13 lns 2-16 (Docket number 139)). The

4

closing took place on April 8, 2004 at the Old Republic Title Company in Sacramento, California. (Ex. A, Dep. Tr. at 24 lns 5-18 and 26 lns 7-13 (Docket number 139)). At the closing, the Debtors met with Jennifer Black, who notarized the various closing documents signed by the Debtors. (Ex. A, Dep. Tr. at 34 lns. 22-25 and 35 ln. 1 and Ex. B, Dep. Tr. at 13 lns 18-23 (Docket number 139)). At the conclusion of the closing, Ms. Black gave the Debtors a complete set of the signed closing documents. (Ex. A, Dep. Tr. at 38-39 and Ex. B, Dep. Tr. at 15 (Docket number 139)).

The Debtors admitted that they signed many documents during the closing but they were unable to specifically remember each document that they signed. (Ex. A, Dep. Tr. at 36-37 and Ex. B, Dep. Tr. at 14-15 (Docket number 139)). Copies of some of the loan documents included in the Debtors' set of the closing documents, which the Debtors admitted contained their signatures included: (1) Adjustable Rate Note for $78,000; (2) Settlement Statement; (3) Truth-In-Lending Disclosure; (4) Notice of Right to Cancel; and (5) an Adjustable Rate Rider. (Ex. A, Dep. Tr. at 117-121 and Ex. B, Dep. Tr. at 23 and 50 (Docket number 139)).

The date April 8, 2004 and the Property address of 727 N. Monroe Street, Lapeer, Michigan 48446 appear on the face of the Adjustable Rate Note. The first paragraph of the Adjustable Rate Note entitled "Borrower's Promise to Pay" states in pertinent part:

> In return for a loan that I have received, I promise to pay U.S. $78,000 (this amount is called "principal"), plus interest, to the order of the Lender. The lender is World Wide Financial Services, Inc.
>
> I understand that the Lender may transfer this note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

(Ex. D, ¶ 1 (Docket number 139)). Another paragraph in the Adjustable Rate Note entitled "Uniform Secured Note" states

> This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promise that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.

5

(Ex. D, ¶ 11 (Docket number 139)).

The Settlement Statement indicates that distributions were to be made from the $78,000 loan as follows: (1) Household Finance Corporation for the existing loan and mortgage against the Property of $62,327.26; (2) Comerica for a second mortgage on the Property of $2,880.58; (3) taxes for the year 2002-2003 of $1,282.55; (4) origination costs and fees of $5,108.08; (5) Oxford Bank of $2,288.00; and (6) the Debtors of $4,063.53. (Ex. E (Docket number 139)).

The Truth-In-Lending Disclosure document signed by the Debtors indicates that the Debtors gave a "security interest, mortgage, trust deed, or deed" in "real property" to secure the $78,000 loan from World Wide. (Ex. F (Docket number 139)). The Property address is indicated on the Notice of Right to Cancel and the opening paragraph of this Notice states, in relevant part:

> You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home. You have a legal right under federal law to cancel this transaction, without cost, within three (3) business days from whichever of the following events occur last:
>
> (1) the date of the transaction, which is April 8, 2004; or
> (2) the date you received your Truth-In-Lending disclosures; or
> (3) the date you received this notice of your right to cancel.

(Ex. H (Docket number 139)).

The first paragraph of the Adjustable Rate Rider document states:

> THIS ADJUSTABLE RATE RIDER is made this 8th day of April 2004 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to World Wide Financial Services, Inc. (the "Lender") of the same date and covering the property described in the Security Instrument and located at 727 N. Monroe Street, Lapeer, Michigan 48446 (Property Address)

(Ex. I (Docket number 139)).

On April 14, 2004, World Wide assigned its interest in the April 8, 2004, note and mortgage to New Century Mortgage Corporation. (Ex. 3 (Docket number 51)). On May 17, 2004, New Century assigned its interest in the mortgage to U.S. Bank National Association, as trustee for Home Equity Loan Trust 2004-HE5, by Saxon Mortgage Services, Inc. as its

6

attorney-in-fact. (Ex. 3 (Docket number 51)).

In June 2004, the Debtors began making payments on the loan to New Century. (Ex. A, Dep. Tr. at 56 lns. 11-15 and Ex. B, Dep. Tr. at 19 (Docket number 139)). Less than one year later, however, the Debtors encountered financial difficulties. When foreclosure proceedings were initiated by their lender, the Debtors sought relief by filing their Chapter 13 bankruptcy petition. On their schedules A and D, the Debtors disclosed that the Property was encumbered by a mortgage totaling $77,559.

On December 8, 2005, Saxon Mortgage Services filed a secured proof of claim totaling $83,498.26. Saxon attached several documents to its proof of claim, including: (1) Statement of Arrears listing pre-petition arrears of $5,607.67; (2) Statement of Total Debt, which included the principal balance of $77,592.59 plus other fees; and (3) Notarized Mortgage Instrument providing the total amount owed by the Debtors as $78,000. The Notarized Mortgage Instrument contained the purported signatures of the Debtors. The Debtors reviewed Saxon's proof of claim and the attached supporting documents but did not recognize the Notarized Mortgage Instrument. Upon further review of their closing packet, the Debtors learned, for the first time, that out of all the documents they signed at the closing in April 2004, they did not execute a mortgage on the Property. Upon closer examination of the Notarized Mortgage Instrument, the Debtors realized that the signatures on this document were not their own signatures and that the acknowledgment by the notary was false since it represented that the Debtors appeared before the notary in Oakland County, Michigan, on April 8, 2004.

During their depositions on January 18, 2007, however, the Debtors admitted that they intended to execute a mortgage at the closing in April and would have signed a mortgage if one had been provided to them. (Ex. A, Dep. Tr. at 89 lns. 10-14 (Docket number 139)). The Debtors also admitted that the existing note and mortgage on the Property of $62,327.26 as well as a small second mortgage to Comerica of $2,880.68 were paid off by proceeds from the refinance transaction. (Ex. A, Dep. Tr. at 29 lns. 5-19 and 78-80 and Ex. B, Dep. Tr. at 17 lns 6-17 (Docket number 139)). The Debtors admitted that they were responsible for and obligated to pay back the money they borrowed. (Ex. A, Dep. Tr. at 30 lns. 12-17 and Ex. B, Dep. Tr. at 19 and 23 (Docket number 139)). The Debtors also explained that despite the amount listed in the Settlement Statement, they received the total amount of approximately $6,400 from the refinance

7

transaction.[3] (Ex. A, Dep. Tr. at 54-55 and Ex. B, Dep. Tr. at 17-18 (Docket number 139)).

IV. Discussion

Despite the remand of the District Court, the Debtors oppose this Court's determination of whether an equitable mortgage exists on the Property. The Debtors argue that this issue may not be raised by the Defendants because it is now untimely and was waived by them due to their failure to plead it as an affirmative defense. The Court rejects the Debtors' argument.

This Court must comply with the mandate rule, which requires a lower court "to adhere to the commands of a superior court." Halbert v. Taunt (In re M.T.G., Inc.), 291 B.R. 694, 701 (E.D. Mich. 2003) (quoting Allard Enters., Inc., v. Advanced Programming Res., Inc., 249 F.3d 564, 570 (6th Cir. 2001). Upon receipt of the mandate of an appellate court, "a trial court may not alter, amend, or examine the mandate or give any further relief or review." Id. at 701, n.10 (citing In re Sanford Fork & Tool Co., 160 U.S. 247, 255, 16 S. Ct. 291, (1895)). A trial court must "enter an order in strict compliance with the mandate." Id. When an appellate court remands a case for further proceedings, "the trial court must proceed in accordance with the mandate and the law of the case as established on appeal." Id. (quoting Allard, 249 F.3d at 570)). "The trial court must 'implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.'" Id. (quoting Allard, 249 F.3d at 570 (quoting United States v. Moored, 38 F.3d 1419, 1421 (6th Cir. 1994) (quoting United States v. Kikumura, 947 F.2d 72, 76 (3d Cir. 1991)).

A review of the mandate of the District Court indicates that this Court is required to address two issues. The Court must initially decide whether it is appropriate based on the circumstances in this proceeding to impose an equitable mortgage on the Property. Once this decision is made, the Court must then determine how its ruling on the equitable mortgage issue impacts the Debtors' claimed exemptions on the Property and the Chapter 13 Trustee's motion to sell the property of the estate. In accordance with the mandate, the Court will first consider whether an equitable mortgage should be imposed on the Property.

---

3. This difference is attributed to the Debtors' receiving the funds allocated to Oxford Bank in the Settlement Statement. The funds were not paid to Oxford Bank because the debt to Oxford Bank had been discharged in the Debtors' prior bankruptcy case.

The Debtors contend that the "clean hands" principle of equity prevents this Court from relying on equity to impose an equitable mortgage on the Property. The Debtors assert that the fraud perpetrated by World Wide, New Century, or one of their agents is the type of act that would prevent any equitable relief from being granted to these entities. According to the Debtors, the improper conduct of World Wide, New Century, or their agents may also be imputed to and against U.S. Bank and Saxon, as assignees of New Century, to taint them with "unclean hands" to preclude them from receiving any equitable relief from this Court.

The Defendants disagree and contend that an equitable mortgage should be imposed on the Property because the Debtors intended to voluntarily transfer an interest in the Property as collateral for the funds they borrowed to refinance their existing loans on the Property. In support of their position, the Defendants rely on the following Sixth Circuit Court of Appeals and Michigan case law: Schram v. Burt, 111 F.2d 557 (6th Cir. 1940), and Richardson v. Richardson, 266 Mich. 194, 253 N.W. 265 (1934). The Chapter 13 Trustee concurs in and adopts the arguments made by the Defendants.

In Schram v. Burt, 111 F.2d 557 (6th Cir. 1940), the Sixth Circuit Court of Appeals observed that under Michigan law

> the whole doctrine of equitable mortgages is founded upon the ancient, cardinal maxim of equity which regards that as done which was agreed to be done and should have been done and in applying this rule the court will treat the subject matter as to collateral consequences and incidences as if the acts contemplated by the parties had been done at the beginning of the transaction, always regarding the substance and not the form.

Id. at 562. In Schram, the court granted the creditor's request for an equitable mortgage because while the husband had signed the mortgage on behalf of his wife, he did so because his wife had authorized him to act as her agent.

In Richardson v. Richardson, the court imposed an equitable mortgage because the property owner, even though fraudulently induced to execute a mortgage, received the benefits from the monies obtained by the mortgage loan and the lender did not engage in any improper conduct. Richardson, 266 Mich. 194, 253 N.W. 265, 266 (1934).

A widely known commentator on Michigan real property law has explained that:
a court of equity may impose and foreclose an equitable mortgage on a parcel of

9

> real property when no valid mortgage exists but some sort of lien is required by the facts and circumstances of the parties' relationship. Generally, an equitable mortgage will be imposed if it is shown that there was an intention to place a lien on the real estate or a promise that the real estate would be used as security but for some reason the intended purpose was not accomplished.

1 Cameron, Michigan Real Property Law (3d ed), Mortgages, § 18.5, p. 681-82. See also In re Moukalled Estate, 269 Mich. App. 708, 719, 714 N.W.2d 400, 407 (2006) (observing that an equitable lien or mortgage generally arises from an agreement that identifies the property and reflects an intention that the property will be security for an obligation); and Senters v. Ottawa Savings Bank, FSB, 443 Mich. 45, 53, 503 N.W.2d 639, 643 (1993) (explaining that an equitable mortgage or lien will be declared out of considerations of right and justice and those maxims that lie at the foundation of equity jurisprudence, where a written mortgage contract is lacking but the parties' conduct and relationship demands application of equitable principles).

Based on the facts and circumstances in this case, the Court finds that it is appropriate to impose an equitable mortgage on the Property. The Debtors voluntarily engaged in and pursued the loan with their original lender, World Wide. The address of the Property is reflected on the face of the Adjustable Rate Note and the Adjustable Rate Rider. The Debtors fully understood and acknowledged that they signed a promissory note obligating them to make monthly loan payments for 30 years based on their agreement to use their Property as security. The Debtors admitted that they intended to encumber their interests in the Property. The Debtors were motivated by their desire to reduce their monthly house payment and interest rate and to use some of the equity in the Property to make necessary repairs to their home. Like the property owner in Richardson, the $78,000 loan received by the Debtors provided direct benefits to them. The majority of the loan proceeds were used to pay off the first and second mortgages and property taxes. In addition, the Debtors received almost $6,500 to make improvements to the Property. And, as a result of the refinance transaction, the Debtor's monthly mortgage payment was reduced by approximately $250.00 to $731.05, and their interest rate was lowered from 15.8% to 10.8%, which was subject to adjustment but to a rate that could not exceed 16.8%. (Ex. A, Dep. Tr. at 100 and 111 and Ex. D (Docket number 139)). An equitable mortgage on the Property recognizes and accomplishes what the Debtors wanted to, and did, achieve in 2004 when they refinanced the Property.

To be clear, the Court is not relying on the forged mortgage to provide an equitable remedy to U.S. Bank or Saxon. Instead, "the basis of the recovery [is] the fact that [the Debtors] had major debts paid off without spending a penny through use of lender monies and, if [the Debtors] had their way, to the detriment of the lender." Fair v. Moody, 2008 WL 5382648, at * 12 (Mich.Ct.App. December 23, 2008). Based on the facts in this case, the Court imposes an equitable mortgage on the Property in favor of U.S. Bank National Association, as trustee for Home Equity Loan Trust 2004-HE5, by Saxon Mortgage Services, Inc. as its attorney-in-fact for the full amount of the $78,000 loan.

Additionally, the Debtors' argument that equitable relief should be denied to the Defendants based on the doctrine of unclean hands is unsound. Courts of equity, such as bankruptcy courts, require a party to have clean hands in order to be awarded any equitable relief. "A court of equity will not relieve a party with unclean hands. This doctrine closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief. . . ." Doss v. Green (In re Green), 986 F.2d 145, 150 (6th Cir. 1993) (internal and other citations omitted); see also McFerrence v. B&B Investment Group, 253 Mich.App. 517, 522-23, 655 N.W.2d 779, 783 ("The clean hands maxim is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.").

Although the Debtors' initial lender, World Wide, its assignee, New Century, or their agents may have perpetrated a fraud at the inception of the loan transaction by forging the Debtors' signatures to a mortgage, the record does not show that U.S. Bank or Saxon took part in such deceitful or fraudulent conduct or that they had any connection with the original loan transaction. In litigating this action, the Debtors narrowed the category of culpable parties to their original lender, World Wide, its assignee, New Century, or one of their agents. (Adv. Pro. No. 06-03150, Amd. Compl. (Docket number 4)). Contrary to the Debtors' current position, Debtors did not allege or prove that U.S. Bank or Saxon engaged in any improper conduct.

The Court is troubled by the circumstances in this case. Yet, like the Debtors, U.S. Bank and Saxon were unaware that at the time they received the assignment from New Century the recorded mortgage contained forged signatures and had not been executed by the Debtors. This

fraudulent act was not discovered until the Debtors reviewed the mortgage document. The Court is mindful of the fact that a fraudulent act took place. It would be inequitable, however, to lay the ramifications of this act upon U.S. Bank and Saxon, as assignees, when it has not been alleged or proven that either entity engaged in any improper conduct or were parties to the original loan transaction. Thus, there is no basis for this Court to conclude that U.S. Bank or Saxon have unclean hands to preclude an equitable mortgage from being imposed on the Property.

This determination, however, does not completely resolve all of the issues on remand. The imposition of an equitable mortgage on the Property impacts the objections to the Debtors' claimed exemption in the Property as well as the Trustee's motion to sell property of the estate. These issues have not been addressed by the parties. The Court will schedule a status conference to discuss and implement the process for reaching a decision on these remaining issues.

## V. Conclusion

For the reasons previously stated, the Court imposes an equitable mortgage on the Property in the amount of $78,000. Counsel for U.S. Bank and Saxon is directed to submit an order consistent with this Opinion.

**Signed on April 03, 2009**

                                             **/s/ Daniel S. Opperman**
                                     **Daniel S. Opperman**
                                     **United States Bankruptcy Judge**